280 So.2d 306 (1973)
DIXIE ELECTRIC MEMBERSHIP CORPORATION
v.
Floyd McDOWELL.
No. 9348.
Court of Appeal of Louisiana, First Circuit.
June 20, 1973.
Rehearing Denied July 20, 1973.
*307 Paul H. Dué, Mellon, Cavanaugh & Dué, Denham Springs, for appellant.
Aubrey L. Moore, Baton Rouge, for appellee McDowell.
Before LANDRY, TUCKER and PICKETT, JJ.
TUCKER, Judge.
This is a suit by Dixie Electric Membership Corporation, a Louisiana non-profit membership corporation, organized under Louisiana Revised Statutes 12:401-430, and engaged in the business of transmitting and distributing electricity for power, lighting, heating, or other such uses, in a *308 number of parishes in the State of Louisiana. Plaintiff Dixie Electric sought to expropriate a hundred foot right-of-way in the northern portion of Livingston Parish for the purpose of a 69KV transmission and distribution servitude to give better service in the Watson to Holden, Louisiana, area.
A description of the proposed installation taken from the testimony of Mr. Floyd Barbay, the consulting electrical engineer who designed the transmission line in question, is given below.
The section of the 69KV transmission line running across the property to be expropriated consists of a single pole type of construction with two cross arms at the top. The basic pole is sixty feet tall. It is southern yellow pine, creosoted. The typical pole has a cross arm at the top which is eight feet long, and which is placed 3.5 feet from the top of the pole. There is a six feet space beneath it, between it and the next cross arm which is ten feet long. There is a string of four bells which extends along the crossarms to hold three conductors. The wire is about forty feet above the ground, and the poles are about three hundred feet apart. The pole being sixty feet tall and about sixteen inches in diameter at ground level, is buried eight feet in the ground, with the result that it extends about fifty-two feet into the air. There is one conductor on the tip-top of the pole, which is known as the static. The construction of the wire at this point is three-eighths of an inch in diameter, made of high strength steel. Its primary purpose is to drain off any static charges or lightening charges which might hit the line. This line protects the three conductors which are located beneath it, one conductor on the top crossarm, and two conductors on the bottom crossarm. The wires that carry the "hot electricity," the phase conductors, are 336-400 MCM aluminum, known as 86SR. They have twenty-six strands of aluminum and seven strands of steel. The minimum clearance of this line is twenty-seven feet, although the code calls for only twenty-one feet in an area accessible to pedestrians.
The suits brought by Dixie Electric to expropriate the surface needed for its servitude were consolidated for trial, and judgment was given for Dixie Electric granting the right of servitude and awarding judgments in favor of the several defendants, in varying amounts, for the surface rights expropriated and for severance damage caused to the remainder. Ten of these defendants have appealed or answered the appeal taken against them by Dixie Electric. The right to expropriate by Dixie Electric was not questioned on appeal. The sole question in each appeal centers around the amount of the award made for the surface rights taken and for various and sundry items of damage.
In the instant suit against Floyd McDowell judgment was given against him expropriating a right of way across property owned by him, more particularly described as follows:
"A certain tract or parcel of land situated in Section 26, T-5-S, R-3-E, Livingston Parish, Louisiana, and being more particularly described as follows: From the southwest corner of the northeast quarter of the southeast quarter of said Section 26, run N 0° 03' W 663.01 feet; thence S 89° 33' E, 423.80 feet to a point, said point being the most southerly southeast corner of the property of Floyd McDowell; thence N 0° 03' W, 8.66 feet along the east property line of Floyd McDowell to a point and the Point of Beginning; thence continue N 0° 03' W, 113.88 feet along same to a point; thence N 61° 28' W, 272.35 feet to a point on the most southerly north property line of Floyd McDowell; thence N 89° 37' 30" W. 187.35 feet along same to a point, said point being the most southerly northwest corner of the property of Floyd McDowell; thence S 0° 03' E, 14.62 feet along the most *309 westerly property line of said Floyd McDowell to a point; thence S 61° 28' E, 492.00 feet to a point, and the Point of Beginning, containing 090 acres more or less."
The trial judge awarded Floyd McDowell Six Hundred Seventy-Five and No/100 ($675.00) Dollars as compensation for the property expropriated, Eight Hundred Seventy-Three and 60/100 ($873.60) Dollars as the value of the timber located on the servitude expropriated, and One Thousand and No/100 ($1,000.00) Dollars for severance damages.
Dixie Electric appealed citing as error the awards of the trial judge for severance damage and for the value of the timber in addition to the value of the property expropriated. Floyd McDowell answered the appeal, asking for an increase in judgment as follows:

 Value of land taken $ 920.00
 Value of improvements 2,000.00
 Severance Damages 2,000.00
 _________
 $4,920.00

The jurisprudence of this state is well-settled that no extra award will be made for timber destroyed on a right-of-way expropriated, unless it has value separate and apart from the land on which it stood and can be harvested as a growing crop. This position has been expressed well in State, Dept. of Highways v. Hart, 249 So.2d 310, 316 (La.App. 1st Cir. 1971), as follows:
"We find that the record does not support the lower court's award of $1,000.00 for timber destroyed on the land taken. The income producing value of growing trees, their usefulness or worth as shade trees, or their aesthetic or ornamental value may be considered in determining the value of the land on which they are situated. If, however, trees are not nursery stock which can be dug and sold in the nature of a crop, they cannot be considered a growing crop, and no award can be made for their value separate and apart from the value of the land itself. State Through Department of Highways v. Black, et al., La.App., 207 So.2d 583; State Through Department of Highways v. Matise, et al., La.App., 170 So.2d 709. The timber in question had no value as a `special crop' or `growing crop'. Its value, therefore, may be considered only in determining the value of the land according to its best and highest use. The appraisals of both Drigers and Derbes included the value of the timber taken. The allowance of an extra $1,000.00 for this item of damages must be reversed."
A market value appraisal by Mr. Raymond J. Gascon, Jr., a forester who qualified as an expert, was submitted in evidence which estimated the value of the timber destroyed by Dixie Electric at $326.12. When Mr. Gascon was requested to make the appraisal, the timber on the defendant's property had already been destroyed, but he made an estimate using the best 0.30 acre of timbered land owned by defendant and immediately adjacent to the right of way. The trial judge should have taken this estimate into consideration when setting the value of the surface rights expropriated. There is no showing whatsoever that the timber on the McDowell portion of the Dixie Electric servitude had been used or intended as a cash crop, for ornamental, or for any other purposes. The award of the trial court for the value of the timber in addition to the value of the land expropriated will be reversed.
The award for One Thousand and No/100 ($1,000.00) Dollars for severance damage will be reversed, also, in the absence of any convincing proof of damage to the remainder of defendant's property. The landowner has the burden of proving not only that severance damage has been sustained, but also the amount thereof. Michigan Wisconsin Pipeline Co. v. Fruge, 227 So.2d 606, 610 (La.App. 3d Cir. 1969, writ refused, 255 La. 149, 229 *310 So.2d 732 (1970). Defendant's five acre tract is "S" shaped, sloping to the rear, with the portion expropriated at the very rear of this property separated from the front portion on which defendant has his home by a drainage canal. It has no frontage. Defendant testified that Dixie Electric had caused the canal to overflow and flood his property. He testified also that he had been clearing the land and planning to install a trailer park at the rear of his property as an income producing venture for his retirement. He had located only one trailer there which his son-in-law, William E. Sibley, defendant in a companion suit, was using until he suddenly bought a house and moved into it on the Dixie Electric right-of-way on his own property. Defendant testified further that Dixie Electric had cleared his land fifteen feet on either side of the right-of-way. None of these allegations were corroborated by other evidence or proven sufficiently to show damage, nor was there any proof of the value of his property before the expropriation and the value of it afterwards. Apparently the same Thousand Dollar award for severance damage in this suit was unjustifiably made in seven of the ten suits appealed. The trial judge has given no written or oral reasons for his award, and we do not feel that the record justifies it.
We think it apparent from the close similarity in figures that the trial judge used the appraisal submitted by Dixie Electric's qualified appraiser, Mr. James E. Carpenter, as the basis for his judgment in awarding Six Hundred Seventy-five ($675.00) Dollars for the surface expropriated, and we see no manifest error therein. Mr. Carpenter found the highest and best use of the tract in question to be rural residential. He listed three comparable sales of neighboring properties which ranged in price from Eight Hundred Nine and No/100 ($809.00) Dollars to One Thousand One Hundred Eleven and No/100 ($1,111.00) Dollars. He adjusted the fair market value of defendant's property to be Nine Hundred Thirty-One and No/100 ($931.00) Dollars per acre, or Eight Hundred Thirty-eight and No/100 ($838.00) Dollars for the 0.90 acres taken by Dixie Electric. Mr. Carpenter applied the formula of eighty per cent (80%) for the net value of the servitude usage, which results in a final value of Six Hundred Seventy and No/100 ($670.00) Dollars. It is clear from the description of the installation set forth above that the landowner retains usage of his property for pasturage, which is a higher use than for timber, and for any number of other uses. The installation is simple and probably would not even interfere with the parking of trailers beneath it. Certainly it does not represent a hundred percent taking on the part of Dixie Electric.
Although each of these consolidated cases has resulted in a reduction of the awards to the respective defendant landowners, the general rule is that, unless tender of the true value is made before the taking, the expropriating authority should be taxed with reasonable costs of expert witnesses retained by the landowner to help him obtain the just compensation to which he is constitutionally entitled, since to award him a lesser amount would be to deprive him of the full compensation for the taking constitutionally guaranteed him. See State, Through the Department of Highways v. Babineaux, 189 So.2d 450, 453 (La.App. 3d Cir. 1966) and Dakin and Klein, Eminent Domain, pgs. 325-326. The records in these consolidated cases are unclear on this score, and do not establish that bonafide offers or tenders of the true value of the respective properties were made to the landowners by Dixie Electric. Therefore, reasonable fees for appraisal work and appearances in court as expert witnesses by the respective landowners' appraisers should be fixed and taxed as costs.
While we have attached no significant credence or import to the testimony of the defendant's expert, Earl R. Graham, in resolving the issues at stake, this fact *311 would not justify a complete elimination of his witness fees. See State v. Donner Corporation, 236 So.2d 841, 846 (La.App. 3d Cir. 1970). However, such fees should not be excessive. Under the circumstances here we think the fees of Mr. Graham should be moderate.
There is no absolute rule by which the amount of expert witness fees can be fixed, and a determination of such depends upon the time consumed in preparation, the effort involved, and the extent of their examination of matters on which they express an opinion. Recreation and Park Commission v. Perkins, 231 La. 869, 93 So.2d 198.
In the instant case the services of Mr. Graham were engaged by the defendant McDowell sometime in advance of the trial. Although he was on the property several times, his examination of same was cursory in nature, and he did not examine the records in the courthouse in order to search for his comparables. Under the circumstances here we opine that Earl R. Graham is entitled to a fee of $100.00 for his preparatory work and $50.00 for his appearance in court, and that the total sum of $150.00 should be taxed as costs.
For the reasons assigned the judgment of the trial court awarding compensation for the true value of the land taken for the servitude is amended by reducing this sum from $1,548.60, including a separate award for the timber of $873.60, to the sum of $670.00; the award by the trial court of severance damages is reversed; the expert witness fee of Earl R. Graham is fixed at the sum of $150.00, and same is taxed as costs; and in all other respects the judgment of the trial court is affirmed.
The defendant, Floyd McDowell, is cast with the costs of this appeal; the costs of the trial court are to be borne by the plaintiff.
Judgment affirmed, as amended, in part; reversed in part; and rendered.