TUCKER, Judge.
This is a suit by Dixie Electric Membership Corporation, a Louisiana non-profit membership corporation, organized under Louisiana Revised Statutes 12:401-430, and engaged in the business of transmitting and distributing electricity for power, lighting, heating, or other such uses, in a number of parishes in the State of Louisiana. Plaintiff Dixie Electric sought to expropriate a hundred foot right-of-way in the northern portion of Livingston Parish for the purpose of a 69KV transmission and distribution servitude to give better service in the Watson to Holden, Louisiana, area.
A description of the proposed installation taken from the testimony of Mr. Floyd Barbay, the consulting electrical engineer who designed the transmission line in question, is given below:
The section of the 69KV transmission line running across the property to be expropriated consists of a single pole type of construction with two crossarms at the top. The basic pole is sixty feet tall. It is southern yellow pine, creosoted. The typical pole has a crossarm at the top which is eight feet long, and which is placed 3.S feet from the top of the pole. There is a six foot space beneath it, between it and the next cross-arm which is ten feet long. There is a string of four bells which extends along the crossarms to hold three conductors. The wire is about forty feet above the ground, and the poles are about three hundred feet apart. The pole being sixty feet tall and about sixteen inches in diameter at ground level, is buried eight feet in the ground, with the result that it extends about fifty-two feet into the air. There is one conductor on the tip-top of the pole, which is known as the static. The construction of the wire at this point is three-eighths of an inch in diameter, made of high strength steel. Its primary purpose is to drain off any static charges or lightening charges which might hit the line. This line protects the three conductors which are located beneath it, one conductor on the top cross-arm, and two conductors on the bottom crossarm. The wires that carry the “hot electricity,” the phase conductors, are 336-400 MCM aluminum, known as 86SR. They have twenty-six strands of aluminum and seven strands of steel. The minimum clearance of this line is twenty-seven feet, although the code calls for only twenty-one feet in an area accessible to pedestrians.
The suits brought by Dixie Electric to expropriate the surface needed for its servitude were consolidated for trial, and judgment was given for Dixie Electric granting the right of servitude and awarding judgments in favor of the several defendants, in varying amounts, for the surface rights expropriated and for severance damage caused to the remainder. Ten of these defendants have appealed or answered the appeal taken against them by Dixie Electric. The right to expropriate by Dixie Electric was not questioned on appeal. The sole question in each appeal centers around the amount of the award made for the surface rights taken and for various and sundry items of damage.
In the instant suit judgment was given by the trial court in favor of plaintiff, Dixie Electric Membership Corporation, and against the defendants, Leonard Kinchen, J. Walter Smith, L. Barbee Ponder, Jr., L. Barbee Ponder, III, Charles Law Ponder, John Lynn Ponder, H. Lloyd Smith, Hugh W. Smith, Jesna Smith Murray, Vida Rae Smith, Bonnie Sue Stewart Smith, Shelie Ann Smith and Leslie Lynn Smith, for a right-of-way one hundred feet in width over that property described as follows:
“A certain tract or parcel of land, situated in Section 16, T-6-S, R-5-E, Livingston Parish, Louisiana and being more *344 particularly described as follows: Commence at the northwest corner of the property of Leonard W. Kinchen, et al., thence east 403.18 feet along the north property line of Leonard W. Kinchen, to a point, and the Point of Beginning; then S 68° 24' E, 1377.09 feet to a point on the east property line of Leonard W. Kinchen; thence north 107.SS feet along the east property line of same to a point; thence N 68° 24' W, 1084.93 feet to a point on the north property line of Leonard W. Kinchen; thence west 271.65 feet along the north property line of same to the Point of Beginning, containing 2.83 acres more or less.”
The trial court awarded a servitude of right-of-way to the plaintiff and gave judgment in favor of the defendants in the sum of $2,122.50 for the value of the land taken, and in the sum of $1,000.00 “for servitude use and severance damages in this cause and for all cost and expert witness fees, as fixed by the court.”
Dixie Electric has appealed from the judgment of the trial court, alleging error on its part in apparently setting the value of the land expropriated at an excessive figure of $750.00 per acre, in awarding the landowners the full fee value of the land expropriated, and in awarding severance damage. Defendants answered the appeal, asking for an increase in judgment in the amount of $51,201.00.
No oral or written reasons for judgment were given by the trial judge. Simple arithmetic indicates, however, that $750.00 per acre, as borne out by a supplemental per curiam of the trial judge, was the basis for the award made in this suit as in several of the Dixie Electric suits consolidated for trial. We do not understand how the trial judge arrived at this basis for evaluation in view of the fact that Earl R. Graham, expert witness for nine of the defendants in these consolidated cases, appraised the land at trial for $1,000.00 per acre, while Dixie Electric’s appraiser, James C. Carpenter, appraised it at $466.67 per acre. Averaging estimates of expert witnesses, or drawing a mean between or among them has never been considered a sound basis for judgment in the expropriation suits of this state. We can find no reasonable basis in the record for the trial judge’s evaluation per acre of the land expropriated.
We remain unconvinced by the defendant’s expert witness, Earl R. Graham, who was employed by the defendant on the day before the trial began and viewed defendant’s property from the road only once. Mr. Graham relied upon only two comparable sales when testifying in court. It may be noted that in court Mr. Graham admitted to having had only one real estate transaction in Livingston Parish within the past year, and in fact that he had done very little real estate work within Livingston Parish within the past ten years. Despite the lack of experience with Livingston Parish property Mr. Graham testified glibly in court that the best use of any land in Livingston Parish is residential, and that almost all of the land in Livingston Parish is worth $1,000.00 per acre. Certainly the various comparable sales listed by James C. Carpenter in the ten Dixie Electric cases consolidated for trial are ample proof that there are many sales in Livingston Parish ranging from $300.00 to $500.00 per acre, including the timber thereon, which timber seems to give much of the land in Livingston Parish its highest and best use.
 The two sales he relied upon as comparables are as follows: (1) a sale from Leonard Kinchen to his nephew Damien Kinchen of a ten acre tract at $2,200.00 per acre, and (2) a sale of industrial property which brought a price of $666.00 per acre. The first of these comparable sales is so grossly out of line with most sales in Livingston Parish that it commands little import. Gulf States Utilities Co. v. Hatcher, 184 So.2d 326 (La.App. 1st Cir. 1966). The Kinchen sale, although not necessarily suspect in a large family, was made on the terms of $500.00 *345 cash at the time of the sale, and an installment of over $7,000.00 due in September or October, 1971, which has not been paid. Dixie Electric’s appraiser testified that this property had a highest and best use for timber, but Mr. Graham testified that its best use was for residential property, basing his judgment on the fact that an adjoining ten acre tract had been bought for a subdivision. He testified that a survey had been made for subdividing in September or October, 1970. We find it highly significant, however, that the Dixie Electric survey for the right-of-way herein being litigated was made in July and August, 1970, just prior to the Damien Hinchen survey. We are adversely influenced, also, by the fact that the Hinchen property is located four to five miles from the small community of Holden, La., and the property in between is sparsely settled. See State through the Dept. of Highways v. Shelton, 192 So.2d 161 (La.App. 2d Cir. 1966), writ refused, 250 La. 16, 193 So.2d 528 (1967). No work has been performed to date on the proposed Hinchen subdivision. No demand for this property as a subdivision was established except by Mr. Graham’s vague, undocumented testimony, and no subdivision costs were submitted into evidence, both of which items are required before we can give weight to the testimony that the Damien Hinchen land is valuable as a subdivision. See State through the Dept. of Highways v. Vallon, 182 So.2d 705 (La.App. 4th Cir. 1966). In the light of all the foregoing we find this Hinchen sale of little or no value as a comparable in assessing the value of the defendant’s property.
The second sale relied upon by Mr. Graham was a sale by Mr. Addison, Livingston Parish Clerk of Court, to Berkley B. Boyd, of 18 acres. This sale was made June 28, 1968, before the Interstate 12 was built in this area, which has increased land values 75% according to Mr. Graham. Although the Addison sale was made for $666.00 per acre, it should be noted that this property was industrial property having railroad frontage, and that it was near the steel alloy rolling mill.
We find the appraisal and testimony of Dixie Electric’s appraiser, James C. Carpenter, much more convincing. He said that, although there are a number of small residential tracts in the area, the property in this vicinity is still more timberland in nature than residential, and he concluded that the highest and best use of defendant’s property was for timber, and that it was typical Livingston Parish land. Mr. Carpenter properly and justifiably attached no credence or significance to the Damien Hinchen sale as a comparable with respect to the subject property.
Mr. Carpenter’s exhibits and testimony are quite credible, and his compara-bles are entitled to great weight. They are near defendant’s land, similarly situated, and very much like it in nature. They range in value from $350.00 per acre to $500.00 per acre. Mr. Carpenter adjusted defendant’s land to a value of $466.67 per acre, which, for the 2.83 acres expropriated would amount to $1,320.67. Mr. Carpenter allowed only 80% of fee value due to the fact that defendant landowner would still retain all surface rights to his property, which will remain unfenced. It can be used for pasturage, timber, or a number of other usages, with which the relatively simple installation contemplated by Dixie Electric, will not interfere. We believe the evaluation of Mr. Carpenter is properly supported in the sum of $1,056.80.
The trial court’s award for severance damage will be reversed. The record is completely devoid of any evidence to substantiate any damage to the remainder of defendant’s property to be caused by plaintiff’s expropriation. Defendant has failed to sustain his burden of proving the actual severance damages and of proving the value of his land before and after the taking, all of which are required by the jurisprudence of the state of Louisiana. See Michigan Wisconsin Pipeline Co. v. Frugé, 227 So.2d 606, 610 (La.App. 3d Cir. 1969), *346 writ refused, 255 La. 149, 229 So.2d 732 (1970).
We refer to our rather detailed discussion of the problems entailed and the methods used in fixing expert witness fees, which is contained in our opinion in the consolidated case of Dixie Electric Membership Corporation v. McDowell, La.App., 280 So.2d 306, handed down this day.
In the instant case the services of Earl R. Graham as an appraiser of real estate were engaged by the defendants just prior to the time he testified. It appears that Mr. Graham’s examination and preparatory appraisal work were relatively meager in scope and extent. His statement for services gives no itemization of the hours consumed in the work and the output of effort in reaching his conclusions. It is clear that he did not examine the records in the courthouse to obtain sales upon which he relied as comparables. Under the circumstances here we believe Mr. Graham is entitled to a fee of $50.00 for his preparatory appraisal work and a fee of $50.-00 for his appearance in court as an expert witness and that the total sum of $100.00 should be taxed as costs.