280 So.2d 315 (1973)
DIXIE ELECTRIC MEMBERSHIP CORPORATION
v.
Henry WHITEHEAD.
No. 9350.
Court of Appeal of Louisiana, First Circuit.
June 20, 1973.
Rehearing Denied July 20, 1973.
Writ Refused September 7, 1973.
*316 Paul H. Dué, Mellon, Cavanaugh & Dué, Denham Springs, for appellant.
James H. Morrison and Timothy R. Higgins, Hammond, for appellee Whitehead.
Before LANDRY, TUCKER and PICKETT, JJ.
TUCKER, Judge.
This is a suit by Dixie Electric Membership Corporation, a Louisiana non-profit membership corporation, organized under Louisiana Revised Statutes 12:401-430, and engaged in the business of transmitting and distributing electricity for power, lighting, heating, or other such uses, in a number of parishes in the State of Louisiana. Plaintiff Dixie Electric sought to expropriate a hundred foot right-of-way in the northern portion of Livingston Parish for the purpose of a 69KV transmission and distribution servitude to give better service in the Watson to Holden, Louisiana, area.
A description of the proposed installation taken from the testimony of Mr. Floyd Barbay, the consulting electrical engineer who designed the transmission line in question, is given below:
The section of the 69KV transmission line running across the property to be expropriated consists of a single pole type of construction with two crossarms at the top. The basic pole is sixty feet tall. It is southern yellow pine, creosoted. The typical pole has a crossarm at the top which is eight feet long, and which is placed 3.5 feet from the top of the pole. There is a six foot space beneath it, between it and the next crossarm which is ten feet long. There is a string of four bells which extends along the crossarms to hold three conductors. The wire is about forty feet above the ground, and the poles are about three hundred feet apart. The pole being sixty feet tall and about sixteen inches in diameter at ground level, is buried eight feet in the ground, with the result that it extends about fifty-two feet into the air. There is one conductor on the tip-top of the pole, which is known as the static. The construction of the wire at this point is three-eights of an inch in diameter, made of high strength steel. Its primary purpose is to drain off any static charges or lightening charges which might hit the line. This line protects the three conductors which are located beneath it, one conductor on the top crossarm, and two conductors on the bottom crossarm. The wires that carry the "hot electricity," the phase conductors, are *317 336-400 MCM aluminum, known as 86SR. They have twenty-six strands of aluminum and seven strands of steel.
The minimum clearance of this line is twenty-seven feet, although the code calls for only twenty-one feet in an area accessible to pedestrians.
The suits brought by Dixie Electric to expropriate the surface needed for its servitude were consolidated for trial, and judgment was given for Dixie Electric granting the right of servitude and awarding judgments in favor of the several defendants, in varying amounts, for the surface rights expropriated and for severance damage caused to the remainder. Ten of these defendants have appealed or answered the appeal taken against them by Dixie Electric. The right to expropriate by Dixie Electric was not questioned on appeal. The sole question in each appeal centers around the amount of the award made for the surface rights taken and for various and sundry items of damage.
In the instant suit judgment was given in the trial court in favor of plaintiff granting it a servitude over lands of defendant more properly described as follows:
"A certain tract or parcel of land situated in the north one-half of Section 16, T-6-S, R-5-E, Livingston Parish, Louisiana, and being more particularly described as follows: Commence at the southeast corner of the northwest quarter of the northeast quarter of said Section 16, said point being the southeast corner of the property of Henry Whitehead and the Point of Beginning; thence north 5.08 feet along the east property line of Henry Whitehead to a point; thence N 68° 24' W, 876.80 feet to a point; thence N 73° 25' W, 710.18 feet to a point on the west property line of Henry Whitehead, said point being in the centerline of Hog Branch; thence S 16° 32' W along the west property line of Hog Branch a distance of 100.00 feet to a point; thence S 73° 25' E, 705.82 feet to a point; thence S 68° 24' E, 633.54 feet to a point on the south property line of same to a point and the Point of Beginning, containing 3.37 acres more or less."
Judgment was given in the trial court awarding defendant $2,527.50 for the servitude expropriated; $710.91 for timber damages; and $1,000.00 for severance damages; or a total of $4,237.40. Expert witness fees of $125.00 for Gerald Whitehead and $250.00 for Earl Graham were taxed as costs and ordered to be paid by the plaintiff.
Plaintiff Dixie Electric has appealed alleging error by the trial court in valuing the land taken at $750.00 per acre; in awarding the full value of the land expropriated when only a servitude has been granted; in making a separate award for the timber located on the servitude; and in awarding severance damages.
No oral or written reasons for judgment were given by the trial judge. Simple arithmetic indicates, however, that $750.00 per acre was the basis for the award made in this suit as in all of the Dixie Electric suits consolidated for trial. We do not understand how the trial judge arrived at this basis for valuation in view of the fact that Earl R. Graham, expert witness for nine of the defendants in these consolidated cases, appraised the land at the trial at the sum of $1,000.00 per acre, while Dixie Electric's appraiser, James C. Carpenter, appraised it at $333.33 per acre. Averaging estimates of expert witnesses, or drawing a mean between or among them has never been considered a sound basis for judgment in the expropriation suits of this state. We can find no reasonable basis in the record for the trial judge's evaluation per acre of the land expropriated for the servitude.
We remain unconvinced by the defendant's expert witness, Earl R. Graham, who was employed by the defendant on the Saturday before the trial began on Monday *318 and rode by defendant's property on Sunday. Mr. Graham listed three comparable sales in his letter of appraisal directed to defendant's attorney, but he relied upon only two when testifying in court. In may be noted that in court Mr. Graham admitted to having had only one real estate transaction in Livingston Parish within the past year, and in fact that he had done very little real estate work in Livingston Parish within the past ten years. Despite his lack of experience with Livingston Parish property Mr. Graham testified glibly in court that the best use of any land is residential, and that almost all of the land in Livingston Parish is worth $1,000.00 per acre. Certainly the various comparable sales listed by James C. Carpenter in the ten Dixie Electric cases consolidated for trial are ample proof that there are many sales in Livingston Parish ranging from $300.00 to $500.00 per acre, including the timber thereon, which timber seems to give much of the land in Livingston Parish its highest and best use.
The two sales he relied upon as comparables are as follows: (1) a sale from Leonard Kinchen to his nephew Damien Kinchen at $2,200.00 per acre, and (2) a sale of industrial property valued at $666.00 per acre. The first of these comparables sales is so grossly out of line with most sales in Livingston Parish that it commands little import. Gulf States Utilities Co. v. Hatcher, 184 So.2d 326 (La. App. 1st Cir. 1966). The Kinchen sale, although not necessarily suspect in a large family, was made on the terms of $500.00 cash at the time of the sale, and an installment of over $7,000.00 due in September or October 1971, which had not been paid. Dixie Electric's appraiser testified that this property had a highest and best use for timber, but Graham testified that its best use was for residential property, basing his judgment on the fact that the Kinchen property, ten acres of a 130 acre tract adjoining defendant's property on the east, had been bought for a subdivision. He testified that a survey had been made preparatory to subdividing in September or October, 1970. We find it highly significant, however, that the Dixie Electric survey for the right-of-way herein being litigated was made in July and August, 1970, just prior to the Kinchen survey. We are adversely influenced, also, by the fact that the Kinchen property is located four to five miles from the small community of Holden, Louisiana, and the property in between is sparsely settled. See State through the Dept. of Highways v. Shelton, 192 So.2d 161 (La.App. 2d Cir. 1966); writ refused, 250 La. 16, 193 So.2d 528 (1967). No work has been performed to date on the proposed Kinchen subdivision. No demand for this property as a subdivision was established except by Mr. Graham's vague, undocumented testimony, and no subdivision costs were submitted into evidence, both of which items are required before we can give weight to the testimony that the Kinchen land is valuable as a subdivision. See State through the Dept. of Highways v. Vallon, 182 So.2d 705 (La. App. 4th Cir. 1966). In the light of all the foregoing we find the Kinchen sale of little or no value as a comparable in assessing the value of the defendant Whitehead's property.
The second sale relied upon by Mr. Graham was a sale by Alsay Addison, Livingston Parish Clerk of Court, to Berkley B. Boyd, of 18 acres. This sale was made June 28, 1968 before Interstate 12 was constructed in this area which has increased land value 75%, according to Mr. Graham. The Addison sale was made for $666.00 per acre; however it should be noted that this property was adjacent to industrial property having railroad frontage.
We find the appraisal and testimony of Dixie Electric's appraiser, James C. Carpenter, much more convincing. He said that the highest and best use of defendant's property was for timber, and that it was typical Livingston Parish land. His exhibits and testimony are quite credible. Mr. Carpenter's comparables are entitled to *319 considerable weight. They are near defendant's land, similarly situated, and very much like it in nature. They range in value from $350.00 to $500.00. Mr. Carpenter adjusted defendant's land to $333.33 per acre, for the 3.37 acres expropriated for the servitude, or the sum of $1,123.00. Mr. Carpenter further evaluated this servitude at 80% of its fee value, and said that defendant's use of the surface of his property for pasturage, roads, or any number of other uses would not be impaired by the comparatively simple installation planned. We think Mr. Carpenter's appraisal is grounded in reason and will amend the trial court's judgment by reducing this award to the sum of $898.40 for the servitude expropriated.
The trial court's award for a separate timber allowance will be reversed. Since the timber on defendant's property had no value as a separate crop and was merely taken into consideration in the appraisal of the land value, no separate award for it can be made. See State through the Dept. of Highways v. Hart, 249 So.2d 310, 316 (La.App. 1st Cir. 1971), which in substance holds that where trees are not nursery stock which can be dug and sold in the nature of a crop, they cannot be considered as a growing crop, and no award can be made for their value separate and apart from the value of the land itself. The value of the timber, therefore, may be considered in determining the value of the land for its best and highest use.
Although there were some general and speculative allegations as to the damage to the remainder of defendant's property caused by the expropriation of the servitude, defendant completely failed to prove actual severance damage. Nor did defendant prove the value of his land before and after the expropriation. Defendant has failed to carry his burden of proof in regard to these last two elements of damage, as required by Michigan Wisconsin Pipeline Co. v. Fruge, 227 So.2d 606, 610 (La.App. 3rd Cir. 1969), writ refused, 255 La. 149, 229 So.2d 732 (1970). The award of the trial court for severance damage will be reversed.
The qualifications of the defendant landowner's appraiser, Earl R. Graham, are considerably limited and restricted. His testimony is unconvincing, not reasonably grounded, and entitled to little, if any, probative weight.
For a relatively detailed discussion of the problems entailed and the methods employed in fixing expert witness fees, we refer to the consolidated case of Dixie Electric Membership Corporation v. McDowell, La.App., 280 So.2d 306, decided this day.
In the instant case the services of Earl R. Graham as an expert appraiser of real estate were engaged by the defendant Whitehead immediately prior to the trial date. Mr. Graham's examination and preparatory work were cursory in nature, and very limited in scope and extent. He did not examine the records in the courthouse in search of comparables. Under the circumstances here, we believe that Mr. Graham is entitled to a fee of $50.00 for his preparatory work and $50.00 for his appearance in court as an expert witness, and the total sum of $100.00 should be taxed as costs.
For the reasons assigned the judgment of the trial court awarding compensation for the true value of the land taken for the servitude will be amended by reducing this sum from $3,238.41, including a separate award for the timber of $710.91, to the sum of $898.40; the award by the trial court of severance damages in the sum of $1000.00 is reversed; the expert witness fee of Earl R. Graham is reduced from the sum of $250.00 to the sum of $100.00 and same is taxed as costs; and in all other respects the judgment of the trial court is affirmed.
The defendant, Henry Whitehead, is cast with the costs of this appeal; the costs of *320 the trial court are to be borne by the plaintiff.
Judgment affirmed, as amended, in part; reversed in part; and rendered.